IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| KEVIN WATKINS,<br><br>　　　　　　　　　Plaintiff,<br><br>vs.<br><br>DEBORAH LEE JAMES, Secretary, United States Department of Air Force,<br><br>　　　　　　　　　Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 1:18-CV-169-TC-CMR |

In this employment discrimination case, Defendant Deborah Lee James in her official capacity as Secretary of the United States Department of Air Force (the Secretary or the Agency), seeks summary judgment on all of Plaintiff Kevin Watkins' claims. Mr. Watkins, who is African American and disabled, was employed at Hill Air Force Base (HAFB) until he was dismissed from his job in April 2013. After losing his job, he filed suit claiming that his employer (1) failed to accommodate his disability in violation of the Rehabilitation Act; (2) discriminated against him on the basis of disability, also in violation of the Rehabilitation Act; and (3) discriminated against him on the basis of race (his Title VII claim).

The Agency first asserts that HAFB provided reasonable accommodations to Mr. Watkins. Even then, it says, he was unable to perform the essential duties of his original job with those accommodations, and when he was offered positions he could perform, he rejected the

1

offers. As for the discrimination claims, the Agency points to a record devoid of evidence that anyone at HAFB discriminated against him based on his disability or his race.

For the reasons set forth below, the Motion for Summary Judgment is granted.

## FACTS

Mr. Watkinson suffers from a host of medical conditions, including osteoarthritis; PCL ligament tears; degenerative joint disease in both knees; ruptured Achilles tendon in his right foot; degenerative disc disease with fourteen discs herniated, bulging or fractured; scoliosis in his back; bilateral carpal tunnel in both hands; and bilateral cubital tunnel in both arms. He has a lot of pain which he manages to some extent with medication.

He began working at Hill Air Force Base in 1998 as a machinist. In 2002, he was seen for a herniated disc condition which required permanent restrictions regarding lifting and standing at work.

In 2004, he began working as a Production Controller. In that position, he was responsible for creating and managing paperwork for each piece of equipment involved in repairing aircraft stationed at HAFB. The volume of parts brought in each year for repair was significant (for example, one HAFB supervisor estimated that in 2012-13, between 20,000 and 30,000 parts were brought on site). And the paperwork involved physically handling a substantial amount of paper. The paper accompanying each aircraft part can be up to one hundred pages in length.

Once the part and its paperwork are brought in, the Production Controller must review it, determine whether it is accurate, and sort, staple, and file it. He enters data into the computer system in order to monitor and track the part as it moves through the shop. While the majority of

the job is paperwork, the position also requires moving parts weighing more than ten pounds and kneeling and stooping to attach documents to the machine parts.

In December 2011, Mr. Watkins was treated at the HAFB Occupational Medical Clinic (OMC) for carpal tunnel and bilateral cubital tunnel conditions. These conditions limit the use of his hands and fingers. After a medical evaluation, the OMC physician imposed additional permanent work restrictions, which included avoiding "climbing, repetitive frequent or strenuous gripping with hands, [especially] hand manipulations using pinch grip; rotate [work] that requires frequent repetitive use of hand tools; lifting and carrying limited to 35 pounds occasionally (up to 2x/hr); frequent lifting/carrying allowed up to 10 lbs." (Dec. 7, 2011 Occupational Medicine Services (OMS) Medical Evaluation of Work Status, Ex. E to Mot. Summ. J., ECF No. 19-6 (emphasis added).)

Based on those restrictions, Mr. Watkins submitted a written accommodation request to his then-supervisor, Clint Pixton, in March 2012. In that request, Mr. Watkinson stated:

> I have requested not to have to climb stairs as it states in my restrictions no climbing. I have asked for accommodations with an ergonomic work area with proper seating for my back and knees. I have asked for accommodations with appropriate computer devices such as ergonomic keyboard with padding for carpal tunnel syndrome issues.

(Accommodation Request Form, Ex. F to Mot. Summ. J., ECF No. 19-7.)

HAFB followed up on that request and relocated his office to the ground floor so he would not have to climb stairs. Although HAFB says it gave him an ergonomic chair to accommodate his back and knees, he says he never received one. To help with his carpal tunnel syndrome, his employer supplied cushions for his arms and wrists, which he used along with an ergonomic keyboard he obtained on his own.

Mr. Watkins also asked the bioenvironmental engineering department to evaluate his work station to see whether other accommodations could help him. The department's

representative reviewed the work space in July 2012 and concluded that nothing more could be done. Mr. Watkins asserts that the representative "didn't know what to do, other than suggesting Mr. Watkins possibly raise his desk up." (Pl.'s Opp'n to Mot. Summ. J. at 9, ECF No. 22.)

According to Mr. Watkins, after he was moved to the ground floor, his workload increased and he was doing the work of three production controllers. "As Mr. Watkins' workload increased, his carpal tunnel syndrome symptoms increased." (Id. at 12.)

In July 2012, Mr. Watkins was once again examined by the OMC doctor. Based on the results of that physical examination and an assessment received from Mr. Watkins' private physician, the OMC doctor imposed more work restrictions. The doctor emphatically wrote that there was to be "**no** repetitive, frequent, or strenuous gripping with hands; **no** pinch grip, no fine hand manipulation; **no** kneeling, bending, stooping." (July 18, 2012 OMC Medical Form (emphases in original), Ex. I to Mot. Summ. J., ECF No. 19-10.)

Although the restrictions were absolute, Mr. Watkins' physicians agreed that he was a good candidate for carpel tunnel surgery, and that such surgery might resolve some of Mr. Watkins' physical limitations. Despite their recommendation, Mr. Watkins decided not to have the surgery. He explained his decision, saying he "had carpal tunnel surgery in 2003, … that a second surgery was not recommended, but just given as an option, but it could likely make things worse." (Opp'n at 15.)

According to the Secretary, after the OMC doctor increased the restrictions, the HAFB bioenvironmental engineering department again evaluated Mr. Watkins' work space to determine whether there were other accommodations that would allow him to perform the duties of the

Production Controller.[1]  And again they concluded that nothing more could be done.

Yet Mr. Watkins asserts there were other accommodations that would have allowed him to do his job.  Those included "rubber fingertips, voice-activated software, a printer that collated and stapled, working with the incoming Production Controllers, putting parts on shelving off the lower shelf and having machinists (who were already working with the parts) help attach paperwork to the parts."  (Id. at 17.)  As discussed below, those suggestions were not feasible.

With the new work restrictions, his employer determined that Mr. Watkins was no longer able to perform one of the essential functions of his job, i.e., working with his hands to prepare, handle, review, and file hundreds of pages of documents daily.  Consequently, Mr. Pixton, on August 7, 2012, issued a written "Justification for Non-Accommodation of Physically Disqualified Employee Kevin L. Watkins," explaining why Mr. Watkins' position could not be "re-engineered to meet his physical condition."  (Ex. J to Mot. Summ. J. at 336, ECF No. 19-11.)  Other supervisors agreed with the decision.  (Id. at 337.)

After HAFB officially determined Mr. Watkins was no longer able to perform the physical requirements of the job with or without accommodations, Dr. Chris Kleinsmith, Chief of Occupational Medicine at the OMC, medically disqualified Mr. Watkins from the Production Controller position.  (Oct. 2, 2012 Certificate of Medical Examination, Ex. K to Mot. Summ. J. at 335, ECF No. 19-12.)  But he was not dismissed as an employee.

HAFB offered Mr. Watkins a temporary light duty assignment as an escort for visitors.

---

[1] Mr. Watkins contends that no representative came; he says he had no report documenting such a visit. (Opp'n at 16.)  But the Secretary points to undisputed testimony of Clint Pixton, one Mr. Watkins' supervisors, who says he requested a second visit of the bioengineering department after the absolute work restrictions were issued and before preparing the non-accommodation letter. (Reply in Support of Mot. Summ. J. at 5 n.3, ECF No. 23.)  "The fact that Mr. Watkins may not have been aware of the second visit and conversation with Mr. Pixton does not change the fact that it occurred." (Id.)

The position was part of HAFB's Light Duty Program (LDP), typically used for temporary or short time periods when an employee is expected to recover from an injury.

While working in the Light Duty Program, Mr. Watkins asked to be placed in the position of temporary supervisor of Production Controllers. Temporary supervisor is a non-competitive position assigned, at the discretion of the managers, to an employee who then holds the job for up to 120 days. The managers who make the temporary assignments have great discretion. They consider factors such as service dates, performance, and work contribution. The supervisors did not offer the position to Mr. Watkins; instead, they chose Tammy Outlaw, who happens to be African-American, to fill the position. According to HAFB manager Karl Schneider, Ms. Outlaw "had stepped in to help … our master scheduler a lot, coming to our D rep meetings and whatnot, and that was quite a help to us, because she took a lot of responsibilities on that weren't part of her responsibilities." (Tr. of Sept. 6-8, 2017 EEOC Hr'g at 221, Ex. A to Mot. Summ. J., ECF No. 19-2.)

At some point during his tenure in the Light Duty Program, Mr. Watkins suggested he become a trainer of Production Controllers. Karl Schneider, his supervisor, denied the accommodation request because no such training position exists at HAFB. (Id. at 217 ("[W]e don't have folks that are trainers or get paid to train.").)

Mr. Watkins then suggested he could do the job of Production Controller if other employees performed some parts of his job. For instance, he said mechanics could carry and place equipment for him, and "a wage grade employee [could] staple documents together and/or attach the shipping documents to the parts." (Id. at 66 (testimony of Kevin Watkins).) Management rejected his proposal.

6

Ultimately, management decided that Mr. Watkins could not return to his original job because Mr. Watkins' physicians (the OMC doctor and his private physician) concluded Mr. Watkins had reached his "maximum medical improvement" (MMI), which was not sufficient to send him back to the Production Controller job.[2] In other words, the doctors determined that Mr. Watkins' serious physical limitations were not improving and would continue to deteriorate without surgery (which he had decided to forego).

Given the temporary nature of LDP assignments, HAFB's only option was to place him in the Physically Disqualified Program (PDP). Human resource specialists in the PDP work to find new positions for employees, such as Mr. Watkins, who have been medically disqualified from their jobs. The HAFB human resource specialists look for permanent positions the employee can perform with or without reasonable accommodations. Even if the position is below the employee's pay grade, the employee would receive the same pay he received in his original job. Once the specialist finds positions, HAFB offers them to the employee. If the employee declines the offers, HAFB dismisses the employee.

The PDP manager, Andrea Sun-Choon Rathbun, met with Mr. Watkins frequently over the next six months while she looked for positions. In February 2013, she finally identified twelve jobs. Mr. Watkins expressed interest in two of those jobs—equipment specialist and management analyst—both of which Ms. Rathbun offered to him. But he rejected the job offers despite Ms. Rathbun's attempt to dissuade him from doing so.

---

[2] "Maximum Medical Improvement" (MMI) is part of the LDP. Pleshette Brown-Wescott, the Light Duty Program manager at the time, explained that employees in the LDP "go to the clinic regularly so that the doctor can track their restrictions, basically, check their improvement. If they're not getting better, if their symptoms are getting worse and the doctor feels like they're not going to improve any more, then they are at maximum medical improvement. … When they reach [MMI] and they're unable to perform their duties, then they are moved into the Physically Disqualified Program." (Tr. of EEOC Hr'g at 182–83.)

As a result, in March 2013, HAFB sent him a Notice of Proposed Separation for Physical Disqualification. And in April 2013, HAFB dismissed Mr. Watkins, who then received medical retirement and social security disability benefits.

Mr. Watkins has numerous complaints about how Ms. Rathbun handled the process. He believes she did not do enough to help him. For instance, he says she required him to interview for the jobs. And, according to Mr. Watkins, she suggested jobs that were not a good fit for him.

He explains his reasons for rejecting the two job offers (although he does not describe the other ten jobs she offered or why he was not interested in them). For one job, he was concerned that the supervisor, with whom he had an earlier conflict, would not be fair to him. As for the other job, he said the position did not come with formal training, the job requirements conflicted with his work restrictions (and he did not have time to figure out whether accommodations were possible), and he would have been placed in a lower grade position with no foreseeable chance for promotion. (See Opp'n at 23; Decl. of Kevin Watkins at 12–13, Ex. 2 to Opp'n, ECF No. 22-2.)

Still, after he rejected the offers, he returned to Ms. Rathbun a few days later and said he had changed his mind about one of the jobs. He asked to be appointed to that position, but by then, HAFB had hired someone else for the job.

He complains that he was not given the five days required under PDP policy to consider the offer. But the record shows otherwise. Ms. Rathbun offered him the jobs in writing on February 4, 2013, and he rejected the offers, in writing, on February 12, 2013. Ms. Rathbun testified that she would have given him more time to consider the offer if she had known he needed it or if he had asked. But he did not ask.

After he was dismissed in April 2013, Mr. Watkins filed a claim with the EEOC, alleging failure to accommodate and discrimination based on disability and race. In September 2017, the EEOC held an evidentiary hearing. After the three-day hearing, the EEOC administrative law judge denied Mr. Watkins' claims. (See Aug. 13, 2018 EEOC ALJ Decision, ECF No. 1-1.) This lawsuit followed.

## ANALYSIS

### Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)).

If the moving party does not bear the burden of persuasion at trial, he may be able to obtain summary judgment by showing lack of evidence on an essential element of the non-moving party's claim. Teets v. Great-West Life & Annuity Ins. Co., 919 F.3d. 1232, 1243 (10th Cir. 2019). If the movant satisfies that initial burden, the nonmovant, to avoid summary judgment, must present facts from which a jury could find for him. Id. "These facts must establish, at a minimum, an inference of the presence of each element essential to the case." Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137–38 (10th Cir. 2016). And they must be supported by admissible evidence such as affidavits, deposition transcripts, or specific exhibits. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998) (internal citations and quotation marks omitted). That said, when evaluating a motion for summary judgment, the court

must view the admissible facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d at 1215. If the nonmoving party cannot provide facts "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," Savant Homes, 809 F.3d at 1138, the movant is entitled to summary judgment.

**Claims Relating to Mr. Watkins' Disability**

Because Mr. Watkins was employed by a federal agency, he brings his disability-related claims under the Rehabilitation Act of 1973 rather than the Americans with Disabilities Act[3] (ADA). But the standards are the same. See Rehabilitation Act of 1973 § 504(d), 29 U.S.C. § 794(d) (directing that standards for determining whether the Act has been violated are those applied to claims under the ADA). Both Acts prohibit an employer from discriminating against a qualified disabled employee because of that person's disability. Id. § 504(a), 29 U.S.C. § 794(a); ADA § 102, 42 U.S.C. § 12112(a).

1. **Failure to Accommodate**

Discrimination against a qualified individual on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." 42 U.S.C. § 12112(b)(5)(A).

The Act requires an employer to provide reasonable accommodations to a disabled employee who is otherwise qualified to do the job. Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1118 (10th Cir. 2004). To establish a prima facie case of failure-to-accommodate, a plaintiff must show that (1) he is disabled, (2) he is qualified, with reasonable accommodations,

---

[3] 42 U.S.C. § 12111 et seq.

10

to perform the essential functions of the job; and (3) he requested a reasonable accommodation. Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017); Osborne v. Baxter Healthcare Corp., 798 F.3d 1260, 1269 (10th Cir. 2015); Sanchez v. Vilsack, 695 F.3d 1174, 1177 (10th Cir. 2012); Mason, 357 F.3d at 1118; ADA, 42 U.S.C. § 12111(8). "[F]or an accommodation to be reasonable, it must actually enable the employee to perform the essential function at issue." Osborne, 798 F.3d at 1271–72.

If the employee provides evidence to support a prima facie case, the burden "'shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer.'" Punt, 862 F.3d at 1050 (quoting Smith v. Midland Brake, Inc., 180 F.3d 1154, 1179 (10th Cir. 1999) (*en banc*)).

No one disputes that Mr. Watkins is disabled under the statute. But the Secretary asserts Mr. Watkins does not have evidence to establish that reasonable accommodations would allow him to perform the essential functions of the Production Controller job. "The determination of whether a requested accommodation is reasonable 'must be made on the facts of each case taking into consideration the particular individual's disability and employment position.'" Id. (quoting Mason, 357 F.3d at 1123–24).

Manually handling paperwork was essential to the Production Controller job. Mr. Watkins admits that the majority of the job "does deal with handling, reviewing, processing and filing many pages of paper documents on a daily basis." (Opp'n at 16.) And he stated in his declaration that at work he was "unable to grasp papers because [he] could not pinch or grip with [his] hands." (Decl. of Kevin Watkins at 964, Ex. B to Mot. Summ. J.)

11

The doctor's restrictions ("**no** repetitive, frequent, or strenuous gripping with hands; **no** pinch grip, no fine hand manipulation") prevented him from performing that function. So only a reasonable accommodation would have qualified him for the job. But no reasonable accommodation was available for that position.

The requested accommodations[4] would not have solved the paperwork problem and, in some cases, were not the types of solutions the ADA requires employers to implement. Moreover, Mr. Watkins rejected the only possible reasonable accommodation that his employer independently offered while he was in the PDP: re-assignment to another position with the same pay.

According to Mr. Watkins, reasonable accommodations would have included "rubber fingertips, voice-activated software, a printer that collated and stapled, working with the incoming Production Controllers, putting parts on shelving off the lower shelf and having machinists (who were already working with the parts) help attach paperwork to the parts." (Opp'n at 17.) These were not reasonable.

Dr. Kleinsmith testified that using rubber fingertips would not have helped Mr. Watkins with his fine hand manipulation or the pinch grip necessary to perform the paperwork required by his position. (Tr. of EEOC Hr'g at 160.) Voice-activated software would not address the physical handling of paper. Nor would a printer that collated and stapled. Indeed, Clint Pixton testified that

> [t]here is no reengineering for paperwork. There's nothing that can perform those functions for you. We had electronic staplers in the office. They were on copy machines so they could do the stapling for him, but they couldn't file the paperwork, they couldn't lift it, they couldn't move it, they couldn't sort it.

---

[4] It is not clear from the record whether all of the accommodations discussed in the parties' briefs were actually requested by Mr. Watkins while he was employed. But even if he had made a timely request, the suggestions were not reasonable accommodations.

12

> There's so many pages that come in a document . . . . [T]here's nothing electronically that can sort, file paperwork, do the stamping on it, go through the paperwork, check for correct stamping, accuracy, dates, all the other essential paperwork functions that come with that.

(Tr. of EEOC Hr'g at 308–09.)

Mr. Watkins' suggestion that other employees could regularly assist with or take over some of his job duties was not a reasonable solution under the ADA. "[A]n employer is not obligated by the ADA to eliminate or reallocate the essential functions of the job to accommodate a disabled employee." Mason, 357 F.3d at 1123. See also Osborne, 798 F.3d at 1281 n.5 ("An employer need not 'reassign or hire employees to perform functions of a disabled employee's job.'").

Mr. Watkins' request that he become a trainer of Production Controllers was also not a reasonable solution. Training was part of others' responsibilities and there was no position dedicated to training. Under the ADA, "[a]n employer is not required to create a new position for an employee seeking an accommodation." Hawkins v. Schwan's Home Svc., Inc., 778 F.3d 877, 884 (10th Cir. 2015).

Instead of dismissing Mr. Watkins when he could no longer stay in the Production Controller position or the LDP, HAFB looked at other options for Mr. Watkins through the PDP. "[A] reasonable accommodation may include reassignment to a vacant position if the employee is qualified for the job and it does not impose an undue burden on the employer." Taylor v. Pepsi–Cola Co., 196 F.3d 1106, 1110 (10th Cir.1999), quoted in Sanchez v. Vilsack, 695 F.3d 1174, 1180 (10th Cir. 2012). HAFB presented a reasonable accommodation when it offered him twelve other positions he was qualified to perform with his physical disabilities. Mr. Watkins rejected them for personal reasons.

13

In short, Mr. Watkins has not presented evidence that HAFB failed to accommodate his disability. Given the rigid work restrictions on the use of his hands and fingers, no reasonable accommodation would have made him qualified to do the job of Production Controller. And when he was no longer qualified to do that job, HAFB offered a reasonable accommodation that would have allowed Mr. Watkins to be employed at the same pay rate. He declined the offers. The fact that he changed his mind after the position was no longer vacant does not lessen the efforts HAFB took to accommodate him.

Because Mr. Watkins has not established a prima facie case of failure-to-accommodate, the Secretary is entitled to summary judgment on that claim.

### 2. Disparate Treatment on the Basis of Disability

In this claim, Mr. Watkins complains that HAFB declined to hire him as a temporary supervisor and then ended his employment in 2013 because he is disabled.

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation, the plaintiff must establish a prima facie case of disability discrimination by showing that (1) he is disabled; (2) he was qualified for the job, and (3) he was discriminated against because of his disability. Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1192 (10th Cir. 2018).

Because Mr. Watkins has not presented direct evidence of disability discrimination, he must rely on circumstantial evidence to prove his case. Accordingly, the court uses the McDonnell Douglas burden-shifting framework to evaluate his discrimination claim. Id.

14

Under that framework, if the plaintiff presents a prima facie case, "the burden shifts to the employer to articulate a 'legitimate, nondiscriminatory reason' for not hiring the plaintiff." Id. at 1193. And if the employer provides a "satisfactory reason," the burden shifts back to the plaintiff to establish that the employer's stated reason is simply a pretext for discrimination. Id.

The Agency claims that Mr. Watkins has not established a prima facie claim of disability discrimination. Although it does not dispute that Mr. Watkins is a disabled individual under the statute, it challenges his claim that he was qualified for the job and that his disability was a determining factor in HAFB's hiring decisions.

As in a failure-to-accommodate claim, a plaintiff is qualified for the job if he was able to perform the essential functions of the job with or without reasonable accommodation. 42 U.S.C. § 12111(8) (defining "qualified individual"). The analysis above shows that Mr. Watkins has not established that he was qualified to do the job of Production Controller with or without a reasonable accommodation.

Mr. Watkins also asserts that HAFB discriminated against him based on his disability when it gave the temporary supervisor position to Tammy Outlaw. But he has not provided direct or circumstantial evidence that HAFB denied his request for the job because of his disability.[5]

Employees may not compete for the temporary supervisor position. The decision about whom to assign to the temporary supervisor position is highly discretionary. According to the managers who appointed Ms. Outlaw, they felt she was a better candidate. Nothing in the record suggests otherwise. "The mere fact that the plaintiff was qualified for a position but the

---

[5] Although the briefs do not sufficiently address whether Mr. Watkins was qualified to be a temporary supervisor (i.e., that he could perform the job's essential duties with or without accommodations), the court assumes he was.

15

employer selected another qualified individual who was not a member of plaintiff's protected class is insufficient to establish an inference of discrimination." Lincoln, 900 F.3d at 1193.

Because Mr. Watkins has not presented affirmative evidence that his disability was a determining factor in his employer's decision to hire Tammy Outlaw as temporary supervisor, he has not established the third element of his prima facie case. See id. ("[T]he inference of discrimination element of the prima facie case 'requires the plaintiff to present some affirmative evidence that disability *was a determining factor* in the employer's decision'") (emphasis in original) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

Finally, even if there were circumstantial evidence to support a prima facie case of disability discrimination related to the temporary supervisor position, Mr. Watkins has not satisfied his burden under the McDonnell Douglas framework. Assuming he has established a prima facie case, the Secretary has articulated a legitimate, nondiscriminatory reason for not hiring Mr. Watkins as a temporary supervisor (i.e., they thought Ms. Outlaw was the best person for the job given her work ethic, experience, and accomplishments). Id. If the employer provides a "satisfactory reason" for its decision, the burden shifts back to the plaintiff to establish that the employer's stated reason is simply a pretext for discrimination. Id. "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." DePaula v. Easter Seals El Mirador, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks and citation omitted).

Mr. Watkins has not shown pretext. He does not demonstrate that the managers' reason for appointing Ms. Outlaw to the position was factually false or that his disability was a primary factor in their decision to pass him over for the job. Because he has not rebutted HAFB's explanation for hiring Ms. Outlaw, he has not satisfied his burden.

For the reasons set forth above, the Secretary is entitled to summary judgment on this claim.

**Mr. Watkins' Race Discrimination Claim**

Mr. Watkins contends that his employer violated his Title VII rights when it denied him the position of temporary supervisor and then dismissed him from employment because he is African American. Title VII makes it unlawful "to fail or refuse to hire or to discharge, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…." 42 U.S.C. § 2000e-2(a)(1).

Mr. Watkins has no direct evidence that his employer discriminated against him because he is African-American. As noted below, the relevant decision-makers all testified that they did not make any decisions concerning Mr. Watkins' employment based on his race. Indeed, Mr. Watkins admitted during the EEOC Hearing that he has no witnesses of racial discrimination against him. (Tr. of EEOC Hr'g at 92–93.)

Without direct evidence, Mr. Watkins' claim must be evaluated using the McDonnell Douglas burden-shifting framework. Khalik v. United Air Lines, 671 F.3d 1188, 1192 (10th Cir. 2012). To establish a prima facie case of discrimination under Title VII, he must present evidence that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated less favorably than others who were not in the protected class. Id.

Certainly Mr. Watkins, who is African-American, is a member of a protected class. Whether he was qualified for the positions at issue is assumed at this point. As for an adverse employment action, his dismissal would certainly qualify, but arguably the loss of the non-

competitive, temporary supervisor position to Ms. Outlaw is not adverse. At any rate, his claim fails primarily because he has no evidence that he was treated less favorably than someone who is not in the protected class.

Concerning the temporary supervisor position, each person involved in assigning Ms. Outlaw to the temporary supervisor post stated under oath that Mr. Watkins' race had nothing to do with their decision. (See Decl. of Karl Schneider at 1001–02, Ex. D to Mot. Summ. J., ECF No. 19-5; Decl. of Hal Olmstead at 1012, 1014, Ex. U to Mot. Summ. J., ECF No. 22.) Also, Ms. Outlaw is African-American, a fact that discredits Mr. Watkins' assertion that management discriminated against him because he is African-American.

As for Mr. Watkins' dismissal in April 2013, there is no evidence that the accommodation process and the medical disqualification decision were based on his race. Those employees involved in the accommodation decisions testified that Mr. Watkins' race had nothing to do with the actions they took. (See Tr. of EEOC Hr'g at 308 (testimony of Clint Pixton), 122–23 (testimony of Rick Sanchez), 273–74 (testimony of Andrea Rathbun); Decl. of Dr. Christopher Kleinsmith at 1060–61, Ex. C to Mot. Summ. J., ECF No. 19-4; Decl. of Karl Schneider at 1001–02, Ex. D to Mot. Summ. J., ECF No. 19-5; Decl. of Pleshette Brown-Westcott at 1033–34, ECF No. 19-15; Decl. of Hal Olmstead at 1012, 1014, Ex. U to Mot. Summ. J., ECF No. 22.) And after HAFB placed him in the Physically Disqualified Program, it offered him twelve jobs for which he was qualified. If he had selected one of those positions, he would have remained employed. But he rejected the offers for personal reasons knowing that doing so would result in his separation. Nothing in the record raises an inference that events leading up to his dismissal and the dismissal itself were related to his race.

Because the record lacks evidence that Mr. Watkins' race played a role in the decisions of the individuals working with him at HAFB, he has not established a prima facie case of Title VII discrimination. Accordingly, the Secretary is entitled to summary judgment on this claim as well.

## ORDER

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 19) is GRANTED.

DATED this 8th day of December, 2020.

> BY THE COURT:
>
> *Tena Campbell*
>
> TENA CAMPBELL
> U.S. District Court Judge